[Cite as *In re J.H.*, 2021-Ohio-3846.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

|                      |   |                                      |
|----------------------|---|--------------------------------------|
| IN RE: J.H., L.H., C.H. | : | Appellate Case No. 29126 |
| . | : | Trial Court Case Nos. G-2015-1837-0C, 0D; G-2015-1838-0D, 0E; G-2020-2205-0B, 0C |
|  | : | (Juvenile Appeal from Common Pleas Court) |

. . . . . . . . . .

O P I N I O N

Rendered on the 29th day of October, 2021.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Appellee MCCS

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Dayton, Ohio 45434
    Attorney for Appellant-Father

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Father, the legal father of J.H., L.H., and C.H., appeals from the judgments of the Montgomery County Court of Common Pleas, Juvenile Division, which granted temporary custody of his three sons to Montgomery County Department of Job and Family Services – Children Services Division (MCCS). For the following reasons, the trial court's judgments will be affirmed.

## I. Procedural History

{¶ 2} MCCS first became involved with the family after Mother gave birth to L.H. in prison in February 2015. The couple's oldest child, J.H., born in December 2013, had been left in Father's care while Mother was incarcerated. When prison staff informed MCCS in late March 2015 that Mother and L.H. had been terminated from the prison's ABC's Nursery Program and that L.H. needed to be removed from the nursery setting immediately, MCCS investigated whether L.H. could be placed in Father's home. MCCS determined that Father was having difficulty providing for J.H., then 16 months old, and would be unable to care for L.H., an infant.

{¶ 3} On March 27, 2015, MCCS filed a dependency complaint on behalf of J.H. and L.H. The agency requested temporary custody of the boys and, as to J.H., an alternative disposition of protective supervision. On May 5, 2015, the court found the two boys to be dependent, and on July 10, 2015, the court granted MCCS temporary custody of L.H. and protective supervision of J.H. On September 17, 2015, the trial court concluded that protective supervision of L.H. also was in his best interest. The protective supervision for both children terminated on December 25, 2015.

{¶ 4} Mother, who had been released from prison in June 2015, gave birth to a

third child, C.H., in April 2016.

{¶ 5} MCCS again became involved with the family in January 2020 due to concerns about Mother's mental health and reports of domestic violence involving the parents. On June 25, 2020, MCCS moved to have C.H. declared a dependent child and moved as to all children for temporary custody of the children or, alternatively, protective supervision. The dependency complaint stated that MCCS believed C.H. to be dependent due to concerns of domestic violence in the home, concerns about Mother's mental health, and the parents' lack of cooperation with the agency. MCCS also filed a motion requesting that the parents or other custodian produce the children.

{¶ 6} On July 5, 2020, an incident occurred at Father's home, resulting in MCCS's taking emergency custody of the children. The next day, MCCS filed an amended complaint regarding C.H., now alleging abuse and dependency, and amended motions for temporary custody regarding J.H. and L.H. The same day, the magistrate granted interim temporary custody of the three boys to MCCS.

{¶ 7} On August 19, 2020, the magistrate conducted a hearing on the amended abuse and dependency complaint regarding C.H. and the amended motions for temporary custody regarding L.H. and J.H. Officer Sean Gallagher and after-hours caseworker Chatona Bennett testified regarding the July 5 incident, and ongoing caseworker Tairya Fields testified about her involvement with the family since January 2020. After the hearing, the magistrate found the children to be dependent, and the trial court adopted the magistrate's decision. No objections to the magistrate's decision were filed.

{¶ 8} The magistrate held a remote dispositional hearing on October 21, 2020,

during which Fields testified for MCCS and Father testified on his own behalf. (Mother was present but did not testify.) The testimony focused on the parents' efforts to comply with their case plan. The guardian ad litem orally recommended that temporary custody be given to MCCS.

{¶ 9} Following the hearing, the magistrate ordered temporary custody to MCCS. Father filed objections on November 2, 2020, and requested a transcript. After the transcripts of the August 19 and October 21, 2020 hearings were filed, Father filed supplemental objections in which he argued that temporary custody was against the manifest weight of the evidence. On April 27, 2021, the trial court overruled Father's objections, finding that temporary custody was in the best interest of the children and that MCCS had made reasonable efforts to prevent the removal of the children from their home, to eliminate their continued removal, or to make it possible for the children to return home safely. The court granted temporary custody of the children to MCCS, to expire on June 25, 2021.

{¶ 10} Father appeals from the trial court's ruling. Mother has not appealed.

## II. Standard for Temporary Custody

{¶ 11} In his sole assignment of error, Father contends that the trial court abused its discretion in granting temporary custody of the children to MCCS. He argues that temporary custody to MCCS was not in the children's best interest.

{¶ 12} A juvenile court has broad discretion in the disposition of an abused, neglected, or dependent child. See R.C. 2151.353(A) and Juv.R. 29(D). The dispositional options include, among other things, granting temporary custody to a children services agency, committing the child to the permanent custody of a children

services agency, or awarding legal custody to a relative or any other person. R.C. 2151.353(A). "In choosing among the alternatives, the best interest of the child is the court's primary consideration." *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-Ohio-2066, ¶ 13.

{¶ 13} R.C. 3109.04(F)(1) provides a non-exclusive list of factors to consider when determining which dispositional order is in the best interest of a child. *See In re J.T.*, 2d Dist. Montgomery No. 26839, 2016-Ohio-602, ¶ 21. Those factors are as follows:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers * * *, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a

neglected child; * * *;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶ 14} The court's temporary custody decision "must be supported by a preponderance of the evidence." *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4. Preponderance of the evidence simply means "evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it." *[In re K.S.]*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting *Black's Law Dictionary* (6th Ed.1998) 1882.

{¶ 15} However, "a court has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest." *In re A.W.*, 2d Dist. Montgomery No. 25039, 2012-Ohio-2657, ¶ 17, quoting *In re S.M.* at ¶ 4. The court's determination will not be reversed absent an abuse of that discretion. *In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 66. A trial court abuses its discretion when its decision is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 16} "An order of temporary custody that emanates from an adjudication of dependency, neglect, or abuse is final and appealable under R.C. 2501.02 and R.C. 2505.02." *In re S.M.* at ¶ 5, citing *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990).

### III. Evidence Presented

{¶ 17} Because Mother is not a party to this appeal, we focus on the evidence regarding Father. The evidence at the August 19, 2020 adjudication hearing and the October 21, 2020 dispositional hearing established the following facts.

{¶ 18} According to Fields, in May 2015, J.H. and L.H. were adjudicated dependent. In January 2020, MCCS again became involved with the family due to concerns about Mother's mental health and reports of domestic violence involving the parents. Mother had disclosed that she has a personality disorder and needed to get back on her medication. Mother also reportedly texted Father that she wanted to cut his throat and sell the children for drug money. Fields stated that she heard reports that both parents were using methamphetamines.

{¶ 19} From January 2020 to July 2020, Fields made multiple attempts to visit the home and the children, but she was denied access by Father. Father told Fields that Mother was not living in the home. In May 2020, when Fields was attempting to visit the family, she observed Father talking with someone who was parked in his driveway. Fields believed from her observations that Father was "under the influence of some substance." Father and Mother also were involved in a domestic violence incident, which resulted in charges against Father.

{¶ 20} On July 5, 2020[1], Dayton police officers went to Father's home on a report from Mother that Father had made suicidal statements and she (Mother) was concerned about the welfare of the children. Father also was subject to an arrest warrant for the prior domestic violence. Officer Sean Gallagher testified that, when he arrived at the scene, Sergeant Magill and Officer Connor Matlock were at the front of the home, and he went to the rear to prevent Father from exiting the residence. After additional crews arrived, Officer Gallagher relocated inside the home and learned that Father had barricaded himself in the back bedroom with the three children.

{¶ 21} While in the home, Officer Gallagher observed an empty gun case with live ammunition. The officers believed that Father potentially had a firearm with him and the children. Gallagher further noticed that the living room area had "tools, tires, car parts all over that the children had access to" and there were "some kind of smoking pipes that were sitting in a * * * green plastic bin that was right on the living room table."

{¶ 22} Father made a statement to officers that they needed to contact Crisis Care because he was going to kill himself. The officers informed Sergeant Magill of the statement. The officers then heard Father ask one of the children to hand him something and then say, "No, not that, the other one." Believing the children were in danger and that Father might harm himself, Sergeant Magill instructed the officers to ram the door

---

[1] The record is inconsistent about whether the incident occurred on July 5 or July 6. The testimony at the August 19, 2020 hearing indicated that the incident occurred on July 6. However, that testimony also indicated that the incident occurred on Sunday (July 5, 2020 was a Sunday) and that MCCS received emergency custody of the children in the evening. The agency's amended motions for temporary custody and the amended abuse and dependency complaint, filed the morning of July 6, indicated that Officer Gallagher gave emergency custody of the children to MCCS on July 5. We therefore conclude that the incident actually occurred on July 5.

and enter. The officers did so, and Gallagher and three other officers entered the room. Officer Gallagher saw that Father had grabbed a child to use as a shield to prevent his arrest. Officer Gallagher removed two children from the room while another officer pried the third child from Father's arms. Two other officers then placed Father under arrest; Father was charged with child endangering, resisting arrest, obstructing official business, and felonious assault on a police officer. (Father kicked an officer while they were trying to place him in handcuffs.) No weapon was recovered from the immediate area where Father was arrested.

{¶ 23} Mother was not present during the officers' encounter with Father at the residence. Officers made several attempts to contact Mother and reached her once while the incident was ongoing. They were unable to reach her again following Father's arrest.

{¶ 24} At approximately 7:00 or 8:00 p.m., Chatona Bennett, an after-hours caseworker, was called to the residence. When she went into the home, she observed that the home was "very cluttered," with a "mountain of clothing on one of the couches," and she could "barely pass through." A few pipes were in the living room. In the bedroom, the bed had been overturned and a window had been broken by officers who had attempted to enter through it. Dirty dishes were piled in the kitchen, and "shoes and debris [were] all over the kitchen floor and in the back area of the home."

{¶ 25} Bennett spoke with the children, who were seated in a police cruiser. The children wore only shorts; they did not have shirts or shoes. They had no visible signs of harm. Although a neighbor offered to babysit the children, no parent was available to give permission for the children to be left with the neighbor. Bennett took emergency

custody of the children.

{¶ 26} At the dispositional hearing on October 21, 2020, Fields testified that the three children had been in foster care together since July 2020. Fields had last visited the foster home on October 16, five days before the hearing. All three children were doing well in foster care; two children were in school, and C.H. was in day care. None of the children had special needs, medical issues, or behavioral issues. All of the children's needs were being met.

{¶ 27} Fields stated that the agency had prepared a family case plan. Father's case plan objectives required him to (1) complete a mental health assessment and follow recommendations, (2) complete a drug and alcohol assessment and follow any recommendations, (3) submit to random drug screens, (4) maintain income and housing for the family, (5) meet with his caseworker on a monthly basis and sign releases of information, and (6) visit with the children on a consistent basis. Fields testified that Father had stable and appropriate housing, and he had signed all necessary releases of information.

{¶ 28} Fields testified that Father had completed a mental health assessment with Samaritan Behavioral Health in September 2020; Father had no recommendations from that assessment. Upon cross-examination by the guardian ad litem, Fields further testified that Father had reported that he was previously diagnosed with post-traumatic stress disorder (PTSD), depression, and attention deficit hyperactivity disorder (ADHD). Fields had reviewed the results of Father's mental health assessment, and Father had not disclosed his mental health conditions or his recent threats to kill himself to the examiner. Rather, Father had told the examiner that he was a good father who was good

with the children and that he was completing the assessment at the request of MCCS.

{¶ 29} Fields was unaware if Father had adequate income to support himself and the family. Father had reported to Fields that he had his own lawn care service and performed other "work on the side." Fields had not received any verification of Father's income, and Father did not report what income he received from his business and side jobs.

{¶ 30} Father also refused to complete a drug screen in August 2020, even though Fields informed him that MCCS would consider him to have failed the drug screen. MCCS had not requested a drug screen since August 2020. When asked if the parents indicated a willingness to take a drug test in the future, Fields responded, "No. They pretty much made it clear that they were not willing to work with the agency, that they were hoping that everything would get thrown out like it had before, is what they've always made clear to me. They were very resistant to work with the agency." Fields had requested information from Father's probation officer about drug testing in connection with Father's criminal case, but Fields had not yet received a response.

{¶ 31} Father had supervised visitation with the children once per week for two hours. Fields stated that, approximately 45 percent of the time, the parents would arrive late for visitation, with Father arriving approximately 15 minutes late and Mother arriving about 30 minutes late. On September 21, 2020, Fields terminated visitation early after Father became "really combative" with Fields when she would not allow Mother, who arrived late, into the visit. The parents were "yelling and * * * saying inappropriate things in front of the children." After that visitation, Fields and her supervisor agreed that Fields would not supervise the visits until they had met with the parents. Fields and her

supervisor met with Father and Mother on October 13 and had a productive discussion. Fields then supervised the October 19, 2020 visit. The parents were on time for their last couple of visits and their behavior was appropriate.

{¶ 32} Fields testified that MCCS was seeking temporary custody of the children. With respect to Father, Fields had ongoing concerns about his mental health as well as substance abuse. Fields testified that "[i]t's been reported that both Mother and Father use methamphetamines, and I haven't been able to have them submit to a drug screen."

{¶ 33} Toward the end of Fields's testimony at the dispositional hearing, the trial court indicated that it was "not getting a good sense" of the risk of harm that the children faced if they were to return home. The court asked Fields to explain the reason for the original police removal. Fields told the court that, in July 2020, "there was a report that [Father] was at home and indicated that he was going to harm himself. He then had a pending domestic violence against Mother, and the children were removed because Mother was – they were not able to contact with Mother." The guardian ad litem informed the court that Father had pled guilty to resisting arrest and the remaining charges were dismissed. Sentencing for the resisting arrest was scheduled for December 2020.

{¶ 34} Father testified about his case plan compliance. As to his income, he repeated that he had a lawn care business and did side jobs for his wife's boss. He stated that he could provide bank statements to MCCS and show them deposits to his Cash App account. Father stated he had ample income to support the children. He further testified that he had completed both a drug and alcohol assessment and a mental health assessment. Father explained that his tardiness at visitation was due to stopping for gas or to purchase food or a gift for the children. Father expressed a willingness to

do drug screens for MCCS.

{¶ 35} When asked on cross-examination about the July 5 incident, Father denied that he had barricaded himself in a room with his children. He also explained on cross-examination his prior refusal to take a drug test, saying that he was exercising his Fifth Amendment rights and wanted to speak to an attorney first. Father further indicated that, when he completed his mental health assessment with OneFifteen, they were aware that he had an antisocial personality disorder, ADHD, depression, and PTSD. Father stated that he received monthly therapy and counseling prior to the pandemic, and that he took medication for ADHD and to sleep.

{¶ 36} The guardian ad litem provided a written report prior to the October 2020 hearing and orally recommended at the hearing that temporary custody be given to MCCS. The guardian ad litem expressed concern that the parents had not addressed their mental health issues and that there were reports of drug abuse. He told the court, "* * * quite frankly, I would like to see them do a drug screen, and if they can show they have a few clean drug screens, I think that could go a long way towards us having a clear understanding of whether or not these parents are, in fact, sober or not." The guardian ad litem further expressed that he would "love to see the visitation transitioning back into their home" if the parents were sober and getting their mental health issues addressed.

### IV. Best Interest of the Children

{¶ 37} Based on the evidence presented at both hearings and the guardian ad litem's recommendation, the trial court found that granting temporary custody of J.H., L.H., and C.H. to MCCS was in the children's best interest. In its decision, the trial court highlighted Officer Gallagher's and Caseworker Bennett's testimony about the July 5

incident and Caseworker Fields's interactions with the family, including Fields's information about the parents' mental health issues, domestic violence, and reported drug abuse.   The court concluded:

> Officer Gallagher testified about a very serious and potentially harmful altercation involving Father and all three children, supra.   Additionally, the children were removed from their home just a few months prior to the hearing held on October 21, 2020, and the parents have not yet successfully completed their case plan.   Collectively, the evidence demonstrates that more time is needed for the parents to work their case plan to properly determine if reunification is in the children's best interest.

{¶ 38} On appeal, Father claims that the trial court's ruling was against the manifest weight of the evidence and an abuse of discretion.   He argues that Bennett made no effort to contact Mother on July 5 and did not allow a neighbor to care for the children in lieu of MCCS's taking emergency custody of the children.   Father further emphasizes that he has adequate income, that he completed a drug and alcohol assessment, that there was no evidence that he used drugs, that he completed a mental health assessment and had no recommendations for follow-up, and that he has been visiting with the children.

{¶ 39} The trial court found that there was no testimony presented regarding the parents' wishes.   While Father did not directly testify that he wanted the children returned to him, Father's testimony focused on his efforts to complete the case plan.   Fields also testified that between January and July 2020, the parents were generally uncooperative with MCCS, and Father maintained that the family was "fine."   The record indicates that

Father believed that temporary custody to MCCS was unnecessary.

{¶ 40} The trial court indicated that it had not interviewed the children and that there was no testimony related to the factors set forth in R.C. 3109.04(F)(1)(f), (g), (i), and (j). We similarly find those factors to be inapplicable.

{¶ 41} In reviewing the children's interaction and interrelationship with parents and siblings (R.C. 3109.04(F)(1)(c)), the trial court reasonably emphasized the July 5, 2020 incident, crediting Officer Gallagher's and Bennett's testimony regarding what occurred. During that incident, Officer Gallagher was informed that Father had barricaded himself in the back bedroom with all the children. Father made statements about killing himself. Having observed an empty gun case and live ammunition, Gallagher believed that Father had a firearm with him and the children in the rear bedroom. (No firearm was found during a search incident to Father's arrest.) After officers forcibly entered the room, Father grabbed one of the children to use as a shield to prevent his arrest. This incident resulted in charges against Father for endangering children, resisting arrest, obstructing official business, and felonious assault on a police officer. The incident reasonably raised questions about Father's mental health, his ability to appropriately care for the children, and the safety of the children if they were returned to the home.

{¶ 42} Officer Gallagher and Bennett also described a home in disarray. Officer Gallagher testified that the home contained tools, tires, car parts, and smoking pipes. Bennett testified that the home was very cluttered, including a "mountain of clothing" on one of the couches, dishes piled in the kitchen sink, and shoes and debris all over the kitchen floor and back area of the home. When Bennett spoke with the children on July 5, they were dressed in only shorts.

{¶ 43} Father raises that Bennett did not contact Mother and did not allow a neighbor to care for the children. However, Officer Gallagher testified regarding the police officers' repeated efforts to contact Mother. Although they spoke with Mother once during July 5 incident, Mother could not be reached after Father's arrest. Bennett further explained that she and her supervisor concluded that MCCS could not leave the children with a neighbor without parental consent.

{¶ 44} Addressing the children's adjustment to their home, school, and community, the trial court found that, as of October 21, 2020, all three children were residing together in the same foster home and had been at that home since July 2020. The two older boys were in school, and the youngest was in day care. All of the children were doing well in their foster home placement and their needs were being met.

{¶ 45} In addition, Father and Mother had visitation with the children once per week for two hours. Although the last couple of visits prior to the October 21, 2020 hearing had gone well, Fields testified that the parents were repeatedly late for visitation. In addition, one September visit was terminated early when Father became "really combative" with Fields when she would not allow Mother, who arrived late, into the visit.

{¶ 46} Father acknowledged having mental health issues and testified that he had antisocial personality disorder, ADHD, depression, and PTSD. He further testified that he received monthly therapy and counseling prior to the pandemic, and that he took medication for ADHD and to sleep. However, the July 5 incident and pending domestic violence charge (reduced to resisting arrest) reasonably raised questions about whether Father's mental health issues were adequately being addressed. The trial court noted Fields's testimony that she had reviewed the results of Father's assessment and noted

that Father had failed to disclose his mental health issues and recent suicidal statements.

{¶ 47} Fields had received reports of drug usage by both parents. Due to the parents' refusal to take a drug test as requested by MCCS, the agency was unable to confirm or dispel those suspicions. Father had previously committed acts of domestic violence against Mother and, as of the dispositional hearing date, had unresolved criminal charges pending based on a domestic violence incident.

{¶ 48} Finally, the trial court heard extensive testimony about the parents' efforts to complete their case plans. Based on that testimony, the trial court reasonably concluded Father had not completed all of his case plan objectives, and that while "some objectives are complete or on-going, Mother and Father have not successfully demonstrated that reunification is in the children's best interest." At the conclusion of the hearing, the guardian ad litem expressed his opinion that temporary custody to MCCS was in the best interest of the children.

{¶ 49} Upon review of the record, the trial court's ruling was neither against the weight of the evidence nor an abuse of discretion. The record supports the trial court's conclusions that unresolved questions remained about the Father's mental health and drug use and his ability to support the children. Concurrently, the children were in a safe foster home environment where their needs were being met. The court reasonably concluded that temporary custody to MCCS was in the children's best interest while Father made additional efforts toward his case plan.

{¶ 50} Father's assignment of error is overruled.

## V. Conclusion

{¶ 51} The trial court's judgments will be affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Robert Alan Brenner
Hon. Anthony Capizzi