[Cite as *In re J.H.*, 2023-Ohio-3183.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: J.H., L.H., C.H. | : |
| | : |
| | : |
| | :    C.A. No. 29697 |
| | : |
| | :    Trial Court Case Nos. G-2015-001837-|
| | :    0k,0M,0S; G-2015-001838-0L,0N,0T, |
| | :    G-2020-002205-0I, 0J, 0Q |
| | : |
| | :    (Appeal from Common Pleas Court- |
| | :    Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on September 8, 2023

. . . . . . . . . . .

KYLE WENNING, Attorney for Appellant

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Attorney for Appellee, MCCS

AMY E. BAILEY, Attorney for Mother

. . . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Appellant-Father appeals from a judgment of the juvenile court, which granted the motions of Montgomery County Children's Services ("MCCS") for a first and second extension of temporary custody of his three children, denied Father's motion for

legal custody of the children, and dismissed Father's emergency motion to prevent the children's removal to Georgia to live with Paternal Grandmother as moot. Father also objects to the juvenile court's failure to admit two exhibits.

{¶ 2} Because the first and second extensions of temporary custody have expired and the children remain in the temporary custody of MCCS pending disposition of the motions for custody filed by Paternal Grandmother and MCCS, we conclude that Father's argument that the court erred in granting the extensions of temporary custody is moot. Father's argument that the juvenile court erred in failing to hear his emergency motion in a timely manner is also moot. Father did not complete his case plan objectives, and the juvenile court did not abuse its discretion in denying Father's motion for legal custody. Finally, Father waived any objection to the juvenile court's exclusion of two exhibits relating to his drug testing and income, and plain error is not demonstrated. The judgments of the juvenile court are affirmed.

**Procedural History**

{¶ 3} Some of the procedural history is taken from this Court's prior opinion affirming the grant of temporary custody of the three children to MCCS. *In re J.H., L.H., C.H.,* 2d Dist. Montgomery No. 29126, 2021-Ohio-3846, ¶ 2-9.

{¶ 4} MCCS became involved with the family after Mother gave birth to L.H. in prison in February 2015. J.H., who had been born in 2013, was in Father's care while Mother was incarcerated. In March 2015, Mother and L.H. were terminated from the prison's nursery program. After an investigation, MCCS determined that Father was struggling to provide for J.H. and that he would not be able to care for L.H. MCCS filed

a dependency complaint on behalf of J.H. and L.H., and both boys were placed in protective supervision through December 25, 2015.

{¶ 5} Mother gave birth to C.H. in April 2016. She was no longer incarcerated at that time. In January 2020, MCCS again became involved with the family. MCCS moved to have C.H. declared a dependent child and for temporary custody of all the children, or, alternatively, for protective supervision.

{¶ 6} On July 5, 2020, MCCS took emergency custody of the children. The following day, MCCS filed an amended complaint regarding C.H. alleging abuse and dependency and an amended motion for temporary custody regarding J.H. and L.H. The magistrate granted interim temporary custody of all three children to MCCS.

{¶ 7} Following an August 19, 2020 hearing on MCCS's motions, the magistrate found the children to be dependent; no objections were filed to the magistrate's decision, and the court adopted it.

{¶ 8} The magistrate held a dispositional hearing on October 21, 2020, and thereafter awarded temporary custody of the children to MCCS. Father filed objections and supplemental objections. On April 27, 2021, the court overruled Father's objections, finding that temporary custody was in the children's best interest. We affirmed the juvenile court's judgment on October 29, 2021. *In re J.H., L.H., C.H.,* 2d Dist. Montgomery No. 29126, 2021-Ohio-3846.

{¶ 9} On December 2, 2021, MCCS filed amended motions for a first and second extension of temporary custody, noting that temporary custody was set to expire on June 25, 2022. MCCS noted that a possible relative placement with Paternal Grandmother

had been found in Georgia.

{¶ 10} On March 2, 2022, Father filed a motion for legal custody. He argued that he had completed two mental health assessments with no additional recommendations and had completed parenting classes in 2017. He asserted that he was employed at a property management company and that "a copy of employment verification" would be provided through "discovery/email." Father stated that he lived with Mother in Dayton and visited with the children on Tuesdays from 5:00-7:00 p.m. at the visitation center. He asserted that a grant of legal custody to him was in the children's best interest. On March 10, 2022, Father filed a for motion for an emergency hearing to stop the children from moving to Georgia to live with Paternal Grandmother, arguing that Paternal Grandmother had been abusive to him and his siblings when they were children.

{¶ 11} On April 20, 2022, after a hearing, the magistrate denied Father's motion for legal custody and granted MCCS's motions for extensions of temporary custody. On May 4, 2022, Father filed objections to the magistrate's decision, arguing that the extension of temporary custody was not in the children's best interest. He also argued that no timely hearing had been held on his emergency motion to prevent the children's removal to Georgia, but that when the parties appeared before the magistrate on April 15, 2022, the magistrate determined that the issue was moot because the children were already in Georgia. He noted the magistrate's written decision did not mention his emergency motion.

{¶ 12} On June 7, 2022, MCCS filed motions for legal custody to Paternal Grandmother. On October 17, 2022, MCCS filed motions for permanent custody to

MCCS; these motions asserted that Paternal Grandmother was no longer a placement option for the children and that Father had been evicted from his home in August and was homeless.

{¶ 13} On November 17, 2022, Father supplemented his objections. He reasserted his objection to the children's moving to Georgia to live with Paternal Grandmother, noting that the court had failed to address his concerns that he would be unable to regularly visit his children in Georgia and that it had not provided for "some structure and requirement of reasonable visitation" with him. Father argued that the magistrate had erred by not considering the issue before the children moved to Georgia, despite his timely ex parte motion, and by stating that the issue was moot at a subsequent hearing (although that finding was not included in the order).

{¶ 14} On December 21, 2022, the juvenile court filed an order that resolved several issues. It dismissed Father's emergency motion to prevent taking the children to Georgia as moot. After considering the factors set forth in R.C. 3109.04(F)(1), the court found that MCCS had made reasonable efforts to prevent the removal of the children from their home, to eliminate the continued removal of the children from their home, or to make it possible for the children to return home, yet neither Mother nor Father had successfully demonstrated that reunification was in the children's best interest. The court found that neither parent had made significant progress to warrant reunification, but that their progress had been significant enough to warrant a first and second extension of temporary custody. The court overruled Father's objection as to the first and second extensions of temporary custody.

{¶ 15} The court sustained Father's objection regarding the magistrate's failure to specify a parenting time schedule and included a parenting time order that it found to be in the children's best interest. The court denied Father's motion for legal custody. Father filed a notice of appeal in each case on January 11, 2023.

{¶ 16} On appeal, Father raises three assignments of error: that the juvenile court abused its discretion in granting the first and second extensions of temporary custody and denying his motion for custody, that the court erred in failing to consider his emergency motion prior to the children's relocation to Georgia and in finding it moot, and that the magistrate erred in not admitting two of his exhibits at the hearing.

**Mootness**

{¶ 17} On May 16, 2023, MCCS filed a motion to dismiss this appeal as moot, because the children were no longer in the temporary custody of the agency pursuant to the extensions of temporary custody to which Father objects in this appeal; rather, they were in MCCS's custody "by operation of law until the motions for legal and permanent custody can be resolved." As such, MCCS argues that there are no issues of law or fact raised on appeal that concern an "actual legal controversy." According to MCCS, the temporary orders have expired, and the juvenile court must rule on the pending motions for legal and permanent custody, which it cannot do while this appeal is pending.

{¶ 18} With respect to "actual controversies," the Supreme Court of Ohio has held:

> The "role of courts is to decide adversarial legal cases and to issue judgments that can be carried into effect." *Cryan v. Cryan*, Ohio Sup. Ct.

Slip Opinion No. 2018-Ohio-24, ¶ 9, citing *Fortner v. Thomas*, 22 Ohio St.2d 13, 14, 257 N.E.2d 371 (1970). Thus, when the parties to an action " 'lack a legally cognizable interest in the outcome,' [the] case becomes moot." *Id.*, quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Conversely, "if an actual controversy exists because [the] court [can] grant the requested relief, [then] the case is not moot, and a consideration of the merits is warranted." *State ex rel. Gaylor, Inc. v. Goodenow*, 125 Ohio St.3d 407, 2010-Ohio-1844, 928 N.E.2d 728, ¶ 11. An "appellate court need not consider an issue, and will dismiss [an] appeal, when [it] becomes aware of an event that has rendered the issue moot * * *." *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm'n*, 103 Ohio St.3d 398, 2004-Ohio–5466, 816 N.E.2d 238, ¶ 15, citing *Miner v. Witt*, 82 Ohio St. 237, 238, 92 N.E. 21 (1910); *see also Townsend v. Antioch Univ.*, 2d Dist. Greene No. 2008-CA-103, 2009-Ohio-2552, ¶ 8, citing *Tschantz v. Ferguson*, 57 Ohio St.3d 131, 133, 566 N.E.2d 655 (1991).

*State ex rel. City of Englewood v. Red Carpet Inn*, 2d Dist. Montgomery No. 27590, 2018-Ohio-1224, ¶ 6.

{¶ 19} R.C. 2151.353(G) states:

Any temporary custody order issued pursuant to division (A) of this section shall terminate one year after the earlier of the date on which the complaint in the case was filed or the child was first placed into shelter care, except that, upon the filing of a motion pursuant to section 2151.415 of the Revised

Code, the temporary custody order shall continue and not terminate until the court issues a dispositional order under that section. In resolving the motion, the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of section 2151.415 of the Revised Code.

{¶ 20} While it is true that the extended grant of temporary custody expired in this case, temporary custody was continued by operation of R.C. 2151.353(G) until disposition. Therefore, we agree with MCCS that any argument regarding the allegedly improper grant of the first and second extensions is moot. Moreover, we need not consider the merit of the argument that the juvenile court erred in failing to promptly address Father's emergency motion regarding the removal of the children to Georgia; no remedy is available to Father as to this argument, and it is moot.

{¶ 21} However, Father's argument that the court abused its discretion in denying his motion for legal custody is not moot. An actual legal controversy remains as to the denial of Father's motion for legal custody. Therefore, MCCS's motion to dismiss Father's appeal is denied.

## Custody

{¶ 22} Father's first assignment of error is as follows:

THE TRIAL COURT ERRED IN GRANTING A FIRST AND SECOND EXTENSION OF INTERIM TEMPORARY CUSTODY TO [MCCS], AND

ITS DECISION TO DENY REUNIFICATION AMOUNTED TO AN ABUSE
OF DISCRETION.

{¶ 23} Based upon our determination above that the arguments related to the juvenile court's temporary orders are moot, our analysis of Father's first assignment of error will be limited to the court's denial of his motion for legal custody of his children.

{¶ 24} R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]"   An award of legal custody "vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities."   R.C. 2151.011(B)(19).

{¶ 25} In *In re C.W.*, 2d Dist. Montgomery No. 28781, 2020-Ohio-6849, we observed:

When a juvenile court makes a custody determination under R.C. 2151.353, it must do so in accordance with the "best interest of the child" standard set forth in R.C. 3109.04(F)(1).   *See In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589, 1992-Ohio-144, paragraph two of the syllabus, and R.C. 2151.23(F)(1) (requiring a juvenile court to exercise its jurisdiction in accordance with R.C. 3109.04 as well as other sections of the Ohio Revised Code).   The factors a court must consider in determining a child's best

interest include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and others who may significantly affect the child's best interes[t]; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons.   R.C. 3109.04(F)(1)(c). * * *

"[W]hen determining whether or not to grant an individual or couple legal custody of a dependent child, a court can do so if it finds by a preponderance of the evidence that it is in the best interes[t] of the concerned child.   Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " (Internal citations omitted.) *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6, citing [*In re K.S.*], 2d Dist. Darke No. 1646, 2005-Ohio-1912.

We review the trial court's judgment for an abuse of discretion.   *See In re C.F.*, 113 Ohio St.3d 73, 83, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying abuse of discretion standard to trial court's findings under R.C. 2151.414); *In re A.M.*, 2d Dist. Greene No. 2009 CA 41, 2009-Ohio-6002, ¶ 9. Abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable.   *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

*Id.* at ¶ 6, quoting *In re D.S.*, 2d Dist. Clark No. 2013-CA-51, 2014-Ohio-2444, ¶ 8-11.

**{¶ 26}** The following testimony was adduced before the magistrate on April 15,

2022:

{¶ 27} Tairya Fields testified via Zoom; she was a former MCCS caseworker and had been assigned to the children's case from January 2020 until she left MCCS on April 9, 2022. She testified that the children were removed from the home in July 2020 due to concerns of domestic violence and substance abuse, and they were initially placed in foster care. The children were then placed with Paternal Grandmother in Georgia in March 2022 under the Interstate Compact on the Placement of Children ("ICPC"), and they were doing well there. According to Fields, prior to their placement with Paternal Grandmother, the children had visits with Paternal Grandmother, which they really enjoyed. Paternal Grandmother would come to visit them, spend time with them, and take them to a museum and out to eat. There were no concerns raised in Paternal Grandmother's home study, and Fields expressed no concerns about the placement.

{¶ 28} Fields testified that a case plan was created for the family. Fields noted that there was a concern about "ongoing domestic violence" between Mother and Father. She noted that Mother's drug screen was also positive for "high levels of methamphetamine and amphetamine." Fields stated that Mother had disclosed to her that she "really has an issue with alcohol" more so than drugs. Prior to the hearing, Mother advised Fields that she was pregnant.

{¶ 29} According to Fields, Father's case plan objectives required him to complete a mental health assessment, a drug and alcohol assessment, and a parenting and psychological assessment, and to follow the recommendations of all three assessments. He was required to meet with a caseworker monthly, sign releases of information, visit

his children on a regular basis, submit to regular and random drug screens, and maintain suitable housing and income.

{¶ 30} Fields stated that Father and Mother resided together. Fields had not seen the inside of their home since April or May 2021, and she had been told they were living in their car. Fields testified that she was unaware if Father was employed; she was never provided with any verification of his employment, such as pay stubs or bank statements. She stated that Father indicated to her that he "donates plasma."

{¶ 31} Fields testified that Father had completed a mental health assessment at Samaritan Behavioral Health, and there were no further recommendations. She was not aware whether Father had completed a drug and alcohol assessment, although she had referred him to OneFifteen Outpatient Clinic ("OneFifteen") to do so. Fields stated that Father had not completed his parenting and psychological assessment because he "had some legal issues," was arrested, and missed three scheduled appointments. According to Fields, the provider was no longer willing to complete the assessment due to the missed appointments, and Fields gave Father a list of alternative providers at least twice. She did not have any verification that he attempted to contact the alternatives.

{¶ 32} Fields testified that Father had submitted to one random drug screen and was "positive for high levels of methamphetamine and amphetamines"; Father was unwilling to discuss the results of the drug screen with her.

{¶ 33} Fields further testified that Father had failed to meet regularly with MCCS, and she had attempted unsuccessfully to meet with Mother and Father at their home multiple times. Prior to the children's move to Georgia, Fields also attempted to meet

with both parents at their weekly two-hour monitored visitation at MCCS. The parents were required to arrive one hour early for visitations due to having been late or not having shown up for visits. According to Fields, the parents were consistent with visitation initially, but within the most recent six months, they had not been consistent and had stopped showing up for visits.

{¶ 34} Fields recounted that at one visitation, she informed Father that Paternal Grandmother had been identified as a potential placement for the children, and he became verbally aggressive towards her. Father called Fields a "stupid 'A-B'" and told her he was going to beat her "A." Fields stated that sheriffs had to get involved, and it was made very clear to Father that his behavior was inappropriate.

{¶ 35} After the children moved to Georgia, Mother and Father were to visit once a month, with Paternal Grandmother bringing the children to Dayton; the parents were also permitted to schedule time on Zoom to visit. Fields stated that Paternal Grandmother advised her that there had been no virtual visitation; Paternal Grandmother had reported that Father "sent the police to her home" but otherwise had not had any contact with the children. When Fields left her employment at MCCS, she had ongoing concerns regarding Father's mental health, anger management, substance abuse, and parenting practices.

{¶ 36} On cross-examination by Father's attorney, Fields testified that she went to the family's home three times a month in 2022. When asked if she was able to contact the parents, Fields responded "once * * * they were outside and were * * * posting a picture in their vehicle, yes. They were living in their vehicle" in the spring of 2021. Fields

subsequently made announced and unannounced visits to the home. In 2022, whenever Fields went to the home, Mother and Father either were not there or did not answer the door. According to Fields, she did not communicate with them via cell phone because they did not maintain the same phone number, and if she confirmed her visits to the home with the parents via email, nine out of ten times they were not home when she arrived.

{¶ 37} Fields stated that Father had not signed releases of information and told her to get any of his records from his attorney. She had not seen the assessment from Samaritan Behavioral Health and did not know if it was done for both mental health and substance abuse. Fields stated that after Father tested positive for drugs, she referred him again to OneFifteen per agency policy. Fields last asked Father to verify his income in January 2022.

{¶ 38} Jaskiran Kaur, a supervisor at MCCS, testified that she took over the family's case on April 7, 2022. She stated that MCCS was seeking a first and second extension of custody, and that the children remained with Paternal Grandmother in Georgia, where they were doing very well. According to Kaur, Paternal Grandmother's home was appropriate, and an ICPC had been approved through the State of Georgia; approval on the ICPC involved an investigation into the potential placement's prior involvement with Children Services or criminal history, and no concerns had arisen about Paternal Grandmother. She stated that the children were enrolled in school and all their needs were being met.

{¶ 39} Kaur testified that, since April 7, 2022, she had tried unsuccessfully three times to observe the inside of the family's home, and she had not been able to confirm

that they had safe and appropriate housing. Father also had not provided verification of income to her; when she asked Father for employment verification at a meeting in March 2022, he had refused to speak to her and told her any questions she had should go through his attorney. Kaur testified that Father had not completed a mental health assessment or a drug and alcohol assessment, and he had also refused to speak to her about these matters.

{¶ 40} Since Kaur took over the case, Father had not met with MCCS consistently, despite Kaur's attempts to maintain contact with him through unannounced and announced home visits and phone calls. With respect to visitation with the children, Kaur testified that since April 7, 2022, the children had visited via Zoom twice with their parents from Georgia; during these calls, the parents told the children that they were in Georgia temporarily only, which confused the children as to what was going on. Paternal Grandmother was scheduled to bring the children to Dayton on April 20 or 21, 2022, for a visit with the parents.

{¶ 41} Kaur testified that the first and second extensions of temporary custody sought by MCCS were in the children's best interest because the parents had not made much progress with their case plans and the concerns that led to the children's removal had not been rectified. She testified that the children were stable, had safe housing, their basic needs were being met, and the extensions would allow the parents to continue to work on their case plans.

{¶ 42} Kaur stated that Father had not completed his case plan objectives and that the agency had concerns about drug abuse, mental health, lack of stable housing, and

domestic violence.   Kaur stated that there were concerns about arguments and an alleged past incident of domestic violence, and that MCCS intended to refer the parents to the Artemis Domestic Violence Center for classes.   She stated that Father had acted in an aggressive manner with her and walked away or referred her to his attorney when she attempted to talk to him.   Kaur noted that Mother had failed to provide any verification of prenatal care.

{¶ 43} On cross-examination, Kaur acknowledged that Father had not been convicted of domestic violence and that no charges had been filed during MCCS's involvement with the family.   She stated that MCCS wanted to add Artemis classes "because it has been a concern in the past and needs to be addressed based on the aggressiveness of the parents' interactions and how they interact with the [case]workers." She testifed that Father had shared concerns that Paternal Grandmother had not been a good parent to him and had put him in "some kind of a camp," but that these allegations had been looked into and none of the information was found to be "credible or concerning where it affects her ability to care for these boys."   Kaur stated that Paternal Grandmother also had custody of Father's oldest daughter.

{¶ 44} In support of his motion for legal custody of the children, Father testified that he had safe and appropriate housing on Eichelberger Avenue, where he had lived for the last seven or eight years; he stated that Miami Valley Housing Opportunities provided the rent, and he and Mother paid the utilities.   He stated the home had three bedrooms, but that the couple needed to get a new home in six months because Mother was pregnant with twins.   Father testified that he has been diagnosed with attention deficit hyperactivity

disorder (ADHD) and post-traumatic stress disorder (PTSD).

{¶ 45} Father stated that he had signed a release of information in March 2021, when he completed the mental health and substance abuse assessment, and that he was willing to sign a new one. He stated that he had had mental health and substance abuse assessments in both March and September 2021 at OneFifteen; he identified a March 12, 2021 assessment bearing his name from One Fifteen (Defendant's Exhibit 1). He stated that neither assessment made any recommendations regarding mental health or substance abuse. Father stated that he had been on a waiting list since January 2022 to engage in mental health services at Samaritan Behavioral Health after being unable to attend and missing appointments due to the pandemic. According to Father, there was a long waiting list to resume mental health services.

{¶ 46} When asked if he had done additional drug screens after testing positive for drugs in March 2021, Father stated that he had done two drug screens a month at Five Rivers Family Health Center and the emergency room. Father acknowledged that he had not provided the results of the screenings to the caseworker, but instead gave them to his attorney to give to the prosecutor. Father stated that he had accessed the results of the screens through a MyChart portal and had printed them out; he presented them as Defendant's Exhibit 2. Father indicated that he would be willing to print his screenings going forward to give to MCCS.

{¶ 47} Father testified that he did subcontracting work for SJK Properties, namely painting houses, cutting grass, and minor construction work. Father stated that he was paid by Anthony Kunzelman, the owner of SJK Properties, by means of a Form 1099.

Father stated that he had provided his attorney with correspondence from Kunzelman in early 2022 to turn over to the prosecutor, which he identified as Defendant's Exhibit 3. According to Father, the exhibit showed that he had worked for SJK Properties for two years. He also testified that he had provided bank statements to counsel reflecting deposits into his account from his employment, and he identified the bank statements (Defendant's Exhibit 4). Father stated that he had sufficient income to provide for the children's needs.

{¶ 48} Father acknowledged that he had not completed a parenting and psychological assessment. He stated that no one on the list of providers provided to him by Fields had been willing to do the assessment, but that he was willing to work with MCCS to complete it. Father stated that he had missed his first appointment due to being on probation for resisting arrest and that he had successfully completed probation through Dayton Municipal Court in January 2022. Father stated that he missed the second appointment because he was incarcerated, but that the charges were later dropped.

{¶ 49} Father testified that Paternal Grandmother had been "mentally and physically abusive" to him and that Children Services had been "in and around" his life his entire childhood. He stated that Paternal Grandmother had "talked her way out of every Children Services case" she ever had.

{¶ 50} Father stated that he and Mother "were attempting to" attend all their monitored visitations, but if they were even five minutes late, they were turned away. Father did not have reliable transportation, and there were times when he ran out of gas

on his way to visitation.   He stated that Fields told him that she would provide bus passes to him and Mother at their home, but she never did.   Father stated that he had not had any virtual visitation with the children in Georgia.   According to Father, he and Mother had tried contacting the agency, but the agency never returned any of their phone calls; when he attempted to phone or text Paternal Grandmother, she refused to respond. Father stated that he wanted MCCS to help ensure that visitation was consistent and that he only learned at the hearing about the upcoming in-person visit with the children.

{¶ 51} Father testified that he had not spoken to Kaur since she became the caseworker and had not "received an e-mail, phone call, * * * [or] a knock on [his] door." notwithstanding being home "every single day waiting to try to find anything out."   He stated that he had tried to initiate contact with Kaur without success.

{¶ 52} Father stated that he had not used drugs since he tested positive on March 22, 2021, and that he even quit taking his mental health medication, Ritalin, because it "comes up as a false positive for methamphetamines and amphetamines."   He stated if he were to be tested at the hearing, the test would be negative.

{¶ 53} Father asked the court to return the children to his care because he had provided an "ample amount of information and proof" that he had done everything MCCS had asked, and reunification with him was in the children's best interest.   Father asserted that he had "done the case plan to the best of [his] ability."   He stated that, prior to MCCS removing the children, he had been "an excellent father" and bonded to the children.

{¶ 54} Father acknowledged that he had been discharged from Samaritan Behavioral Health in 2021 for missed appointments and that he had not been involved in

mental health services since then.   Father stated that he did not see a problem with stopping his ADHD medication to pass a drug screen.   Father stated that, prior to the children's move to Georgia, they did not know or have a relationship with Paternal Grandmother, and that he had "made it a point" to not have his children know his mother.

{¶ 55} In response to questions by the magistrate, Father stated that Fields had not been to his home since October 2021; he stated that he let Fields into the home once, and then she never came back.   Father stated that Kaur had never been to his home and that he had been there every day.   When the magistrate asked how he could have been at home every day if he was working, he responded: "I have been, but here lately, I've been waiting for this job to come through. * * * We can go two weeks, three weeks without a job, but at the same time, we have enough income because we get paid in one large lump sum at a time."

{¶ 56} In response to further cross-examination about his income, Father acknowledged that Exhibit 4 covered a period from October to December 2021 and showed a balance of $5,000.   When asked about running out of gas multiple times on the way to visitation, Father stated that that "was prior," when he was "in between work and stuff like that," and that he had to make sure his utilities were paid and his vehicle was maintained.   Father stated that he last ran out of gas on the way to visitation in February 2022.

{¶ 57} In its decision extending temporary custody and denying Father's motion for custody, the juvenile court thoroughly considered the R.C. 3109.04(F)(1) factors and the best interest of the children.   The court noted that Mother did not testify and that the

children had not been interviewed in chambers.

{¶ 58} The juvenile court found it significant that Fields and Kaur had been unable to verify that Father's home was suitable for the children and that Father had refused to talk to them. The court noted that, while Father did not want Paternal Grandmother to care for the children, MCCS had no concerns about her ability to do so after the home study was completed, and the children were adjusted to her home, where their needs were being met. The court also noted Father's diagnoses of ADHD and PTSD, and that Mother had disclosed to Fields that alcohol was a problem for her. The court discussed MCCS's ongoing concerns about both parents' substance abuse and mental health and about Mother's pregnancy and whether she was receiving prenatal care.

{¶ 59} Regarding the case plan, the court found it significant that Fields and Kaur had not received any verification of Father's completion of his mental health assessment, although Father indicated that he had. The court found that Father had not been involved in mental health services since early 2021. The court further found that Father had not completed a parenting/psychological assessment after missing multiple appointments, and that he had not completed a drug and alcohol assessment despite receiving a referral. The court noted that Father had referred the caseworkers to his attorney instead of cooperating with them to complete his case plan. The court found that Father had not provided any income documentation to MCCS, and Defendant's Exhibit 3 (from Kunzelman) was not admitted into evidence.

{¶ 60} The juvenile court's order denying Father's motion for legal custody was supported by clear and convincing evidence. The record reflects that Father did not

complete his case plan objectives. He was not consistent with visitation before the children moved to Georgia, did not cooperate with the caseworkers and repeatedly evaded their attempts to visit the home, and behaved in an aggressive and inappropriate manner toward them. There was concern about his and Mother's interactions, including domestic violence, which Kaur testified necessitated a referral to Artemis House. Father asserted in his motion that he had previously completed parenting classes and allegedly did so in 2017, but he had not completed the parenting classes required by the current case plan. Although Father testified that his housing was safe and appropriate, the condition of his housing was unverified, and he acknowledged that the family would need a new home with more room when the twins arrived.

{¶ 61} The trial court did not abuse its discretion in denying Father's motion for custody. Father's first assignment of error is overruled.

**Emergency Hearing**

{¶ 62} Father's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT FAILED TO HEAR FATHER'S EMERGENCY EX PARTE MOTION, AND IT ERRED IN FINDING THAT ISSUE MOOT.

{¶ 63} We discussed this issue above and found this issue to be moot. Accordingly, Father's second assignment of error is overruled.

**Exhibits**

{¶ 64} Father's third assignment of error states:

THE TRIAL COURT ERRED WHEN IT DID NOT ENTER

DEFENDANT'S EXHIBITS 2 AND 3 INTO THE RECORD.

{¶ 65} Exhibit 2 was identified as Father's drug screen results that he printed from his MyChart patient portal. Exhibit 3 was correspondence from Father's employer, Kunzelman, regarding Father's income via an IRS 1099 Form. MCCS objected to the admission of Exhibits 2 and 3. MCCS asserted that Exhibit 2 contained no identifying information establishing where the drug screen was conducted and was not a certified medical record, and it objected to Exhibit 3 because Kunzelman was not called to testify as to the work that Father had done for him under the 1099.

{¶ 66} The court refused to admit the exhibits, reasoning:

> * * * Exhibits 2 and 3 are not admissible. I mean, * * * there's nothing
> on here that - - normally, we have, you know, letterhead and just - -
> something. * * * I've never - - it refers to a 1099, and there's no 1099. Uh,
> the drug screen past results, there's no - - this isn't certified. It doesn't give
> me anything. So I can't - - they're not authenticated. * * *

{¶ 67} Father asserts that he authenticated the exhibits via his own testimony. Although Father objected to the exclusion of the exhibits at the hearing before the magistrate, he did not further raise the issue in his objections to the magistrate's decision. Thus, the juvenile court did not address the exclusion of the exhibits, and Father has waived all but plain error with respect to this issue. *Clayburn v. Clayburn*, 2d Dist. Montgomery No. 274776, 2017-Ohio-7193, citing *Cox v. Cox*, 2d Dist. Montgomery Nos. 18345, 18350, 2000 WL 1838266, *4 (Dec. 15, 2000); Civ.R. 53(D)(3)(b)(iv). "Plain error is an obvious defect in the trial proceeding that affects substantial rights. * * * The alleged

error must have 'substantially affected the outcome of the trial,' * * * such that 'but for the error, the outcome of the trial clearly would have been otherwise[.]' * * *." *State v. Cepec*, 149 Ohio St.3d 1185, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 67.

**{¶ 68}** Father has not demonstrated plain error. There were legitimate concerns about the exhibits, and we are unpersuaded that, even if they had been admitted, they would have affected the outcome of the proceeding in light of MCCS's multiple and ongoing concerns and Father's failure to complete his case plan. Accordingly, Father's third assignment of error is overruled.

**{¶ 69}** The judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and EPLEY, J., concur.